IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS J. CASSELLI, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | No. 20-2456 |
| v. | : | |
| | : | |
| LOUIS DEJOY, POSTMASTER GENERAL, UNITED STATES | : | |
| | : | |
|     Defendant. | : | |

**McHUGH, J.**                                                              **January 26, 2021**
**MEMORANDUM**

    This case involves allegations that the Postal Service discriminated against a union leader based on his race, national origin, and age. Plaintiff Nicholas Casselli, a longtime employee of the Postal Service's Lindbergh Facility in Philadelphia, contends that Joseph Hinton, a member of management, subjected him to derogatory comments and physically assaulted him when he attempted to inspect the facility in his capacity as a representative of Local 89 of the American Postal Workers Union, AFL-CIO ("Local 89"). Casselli has also claimed that the Postal Service ("Defendant") engaged in discrimination when it deactivated his entry badge for several months.

    Plaintiff's decision to sue under antidiscrimination laws is curious, as the facts alleged could just as easily suggest that the conduct complained of reflects an anti-union bias. Nonetheless, under the liberal standard governing motions to dismiss, I conclude that Plaintiff has, albeit narrowly, stated a claim for race discrimination under Title VII. Defendant's motion to dismiss will therefore be denied in part and granted in part.

1

**I.     Standard of Review**

Motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

**II.    Discussion**

Plaintiff claims that he was subjected to disparate treatment and a hostile work environment, in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA"). *See* Compl. ¶¶ 45, 54, ECF No. 1. The Postal Service contends that Plaintiff has failed plausibly to plead that he experienced any adverse employment action and that his claims must be dismissed as a result. *See* Def.'s Mot. Dismiss 11–12, ECF No. 7.

A. <u>Hostile Work Environment Claims Under Title VII and the ADEA</u>

To establish a prima facie hostile work environment claim under Title VII and the ADEA, Plaintiff must show that "[1] the employee suffered intentional discrimination because of his/her [protected status], [2] the discrimination was severe or pervasive, [3] the discrimination detrimentally affected the plaintiff, [4] the discrimination would detrimentally affect a reasonable person in like circumstances, and [5] the existence of *respondeat superior* liability (meaning the employer is responsible)." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995) (applying Title VII standards to ADEA claims).

Title VII is not a "general civility code," and the standard for judging a hostile work environment is a demanding one. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). In assessing whether conduct rises to the level of a hostile environment, courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). "[O]ffhand comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). *See also Nat'l. R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002) (requiring plaintiffs to show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment").

Plaintiff, who is white, has been employed at the Lindbergh facility since March 30, 1985. *See* Compl. ¶¶ 5, 6. Joseph Hinton, an African-American manager, purportedly called Plaintiff an "old man," a "cracker" and a "gangster"[1] in 2013. *Id.* ¶ 16. Hinton also allegedly told Plaintiff that he was a "bad black man" who was going "to kick [Casselli's] white ass." *Id.* On September 5, 2014, Plaintiff, in his capacity as president of Local 89, signed a letter expressing concern regarding "incidents of physical and verbal assault from management against bargaining unit members, including incidents involving Hinton." *Id.* ¶ 14. On October 9, 2014, Plaintiff claims, without elaboration, that he was "subjected to harassment by Hinton" and that the incident was recorded in an "Abusive Supervisor Incident Worksheet." *Id.* ¶ 15. Subsequently, on October 21, 2014, Hinton attacked Caselli and "chest bumped" him twice, shouting that he was not informed that Caselli, who was on a leave of absence to serve as union president, would be present at the facility. *Id*. ¶¶ 17, 19, 20, 21. Hinton also took issue with the fact that Caselli had filed a complaint about him previously. *Id.* ¶ 23.

---

[1] When the allegations are viewed in the light most favorable to the plaintiff, the term "gangster" appears to be a derogatory comment regarding Plaintiff's Italian-American heritage.

With respect to age and national origin, Plaintiff has not sufficiently alleged that he experienced severe or pervasive harassment. Isolated instances will only amount to harassment if they are "extremely serious." *Faragher,* 524 U.S. at 788. Even when viewed in the light most favorable to Plaintiff, Hinton's references to Casselli as a "gangster" and an "old man," Compl. ¶ 16, are not so "objectively offensive as to alter the conditions" of his employment. *Oncale*, 523 U.S. at 81; *cf. Castleberry*, 863 F.3d. at 265 (stating that supervisor's use of the "n-word," coupled with threats or termination could "constitute severe conduct that could create a hostile work environment"). I will grant Defendant's motion to dismiss with respect to these claims.

Plaintiff's claim of a racial hostile environment presents a closer question. Looking backward from the physical attack alleged on October 21, 2014, Hinton's threat the previous year to "kick [Plaintiff's] white ass," Compl. ¶ 16, and reference to Plaintiff as a "cracker, *id.*, do not rise to the level of a workplace "*permeated* with discriminatory intimidation, ridicule, and insult" as required by *Morgan.* 536 U.S. at 116 (emphasis added). Plaintiff's allegation that he was also "subjected to harassment" on October 9, 2014 is wholly conclusory and sheds no light on Hinton's motivations or the severity of the conduct. Compl. ¶ 15. As a result, the viability of Plaintiff's claim turns on whether the October 21, 2014 altercation was motivated by his race.

Plaintiff's union activity would appear to be the most plausible motivation for Hinton's alleged attack. Hinton notably did not use racially derogatory language during the altercation but instead took issue with the fact that Plaintiff, a union official on leave from his usual duties, was present within the facility. *See* Compl. ¶ 19. Another highly probable motive would be Hinton's ire stemming from the fact that Plaintiff had recently signed a letter naming Hinton as a perpetrator of harassment against bargaining unit members. *Id.* ¶ 14. The allegation that Hinton has a pattern of targeting *bargaining unit* employees, not just white employees, further suggests that Hinton was

4

motivated by anti-union sentiment, not racial animus. Viewed in this context, Defendant's decision to limit Plaintiff's ability to access the facility temporarily may have been related to a desire to inhibit union solicitation activities, despite the right of access conferred by the collective bargaining agreement ("CBA") between Defendant and Local 89.[2]

But at this stage of the case I must consider the allegations in the light most favorable to Plaintiff. It is also plausible that Hinton's attack constituted the culmination of the threat he made in 2013 to "kick [Casselli's] white ass," thus linking the incident to Hinton's earlier racially charged statements. Plaintiff's race discrimination claim may proceed on this basis, even if another plausible explanation is that Hinton was motivated by anti-union animus.

Caselli must also show that discrimination was so severe or pervasive as to "alter the conditions of [the employee's] employment and create an abusive working environment." *Moody v. Atlantic City Board of Education*, 870 F.3d 206, 214 (3d Cir. 2017). Defendant claims that Plaintiff cannot make this showing because he does not plausibly allege "how or why temporary limitations on his entry into the Lindbergh Facility affected any of his employment rights, much less his compensation or the terms, conditions, or privileges of his employment." Def.'s Mot. Dismiss 11.

This argument sweeps too broadly. As the CBA between the union and the Defendant provides, Plaintiff remained a Postal Service employee during his leave of absence.[3] Employees on leaves of absence do not forfeit their rights under antidiscrimination law. *See, e.g.*, *Zichy v.*

---

[2] The collective bargaining agreement provides that "duly authorized representatives of the Union" may "enter postal installations for the purpose of performing and engaging in official union duties." *See* Pl.'s Resp. Opp'n Ex. A, at 7, ECF No. 10-1. The record does not indicate whether Plaintiff attempted to enforce his rights under the CBA.

[3] Article 24 of the collective bargaining agreement between the American Postal Workers Union and the U.S. Postal Service refers to "employees on leave with regard to union business" and entitles them to step increases. *See* Pl.'s Resp. Opp'n Ex. A, at 7.

*City of Philadelphia*, 590 F.2d 503, 507 (3d Cir. 1979) (noting that an employer's denial of seniority credit to female workers on maternity leave could violate Title VII). Moreover, there is authority for the proposition that Congress, in enacting Title VII, intended "terms and conditions of employment" to be read in the "broadest possible terms." *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971). [4]

When Plaintiff's pleadings are construed in the light most favorable to him, it appears that Hinton threatened to harm Casselli in 2013 and then physically assaulted him when he entered the facility on October 21, 2014. *See* Compl. ¶¶ 16, 17. It is also plausible that Hinton had input into the employer's decision to ask Caselli to leave the facility and to deactivate his entry badge from October 21, 2014 through March 2015. *Id.* ¶¶ 31, 36. Defendant would have me ignore the fact that the right to access private employer property is an important privilege afforded to employees. *See Com. v. White*, 492 A.2d 32, 34 (Pa. Super. Ct. 1985) (reviewing conviction of former employee for trespass upon company property); *Lechmere, Inc. v. N.L.R.B.*, 502 U.S. 527, 538 (1992) (differentiating between the rights of employees and non-employee union organizers to access employer property). In this case, the Postal Service's policies and practices with respect to off-duty employees' property access are largely unknown. *See Diamond Shamrock Co. v. N.L.R.B.*, 443 F.2d 52, 57 (3d Cir. 1971) (upholding employer non-access rule that differentiated between on-duty employees and off-duty employees). Therefore, I cannot conclude at this early stage that Defendant's decision to revoke Plaintiff's access to company premises did not impact the privileges, terms, and conditions associated with his employment.

---

[4] The Equal Employment Opportunity Commission, for example, claims that "an employer may not discriminate . . . when granting breaks, approving leave, assigning work stations, or setting any other term or condition of employment - however small." *Terms and Conditions of Employment*, https://www.eeoc.gov/prohibited-employment-policiespractices#terms_and_conditions (last visited Jan. 22, 2021).

I also place some weight on the nature of the conduct at issue.  In assessing whether an incident of harassment is "severe," the Supreme Court has attached greater significance to conduct that is "physically threatening" over "mere offensive utterance[s]."  *Harris,* 510 U.S. at 23.  Hinton's status as a member of management, when combined with allegations that he has verbally and physically assaulted employees (including Casselli) on employer premises, could result in a sufficiently intimidating environment that could be said to alter the conditions of Casselli's employment.  Management's decision to ban Caselli from the premises after he was attacked by Hinton could also be viewed as a decision to discipline him, albeit for reasons that are unclear.  *See Zanes v. Fairfield Communities, Inc.*, No. 05–2288, 2008 WL 2780461, at *4 (D.N.J. Jul. 17. 2008) ("undesirable transfer and the allegedly meritless discipline, combined" could constitute hostile environment sufficient to alter the terms and conditions of employment).  Taken together, these events raise the inference that Defendant altered Casselli's terms, conditions, and privileges of employment.

Defendant's motion does not address the other prongs of Casselli's hostile environment claim and I am satisfied that his pleadings suffice at this early stage.  First, Plaintiff has established *respondeat superior* liability, as Hinton, a management-level employee, had actual knowledge of his own conduct against Plaintiff and may have been involved in the decision to deny Plaintiff access to the premises.  *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990).  Second, it is not difficult to conceive that a reasonable person would be impacted by derogatory racial remarks coupled with a physical assault and discipline from management.  And third, Casselli clearly subjectively objected to Hinton's conduct at the time of the October 21st incident, telling Hinton to "stop spitting in [his] face," and in general, when he signed the letter decrying the physical and verbal abuse perpetrated by Hinton on the shop floor.  Compl. ¶¶ 20, 14.  It

remains unclear from Casselli's pleadings, however, how he was subjectively impacted by Hinton's earlier comments that Plaintiff was a "cracker" and that he would kick Plaintiff's "white ass." Compl. ¶ 16.  But the pleadings suffice, even if additional evidence of subjective impact will likely be necessary for Plaintiff to meet his burden of persuasion.

B.  Disparate Treatment Claims Under Title VII and the ADEA

To establish a prima facie case of disparate treatment, a plaintiff must show (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action gave rise to an inference of unlawful discrimination.  *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).  Where plaintiffs allege so-called "reverse" discrimination, a court will disregard the first prong of the *prima facie* case.  *See Iadimarco v. Runyon,* 190 F.3d 151, 157–58 (3d Cir. 1999).  A plaintiff's *prima facie* burden is "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  As the Third Circuit has repeatedly recognized, the requirements of a *prima facie* case are flexible and "the fourth element must be relaxed in certain circumstances."  *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999).  Because Defendant does not contest Plaintiff's qualifications or his membership within a protected class, I will primarily consider whether Defendant has taken an adverse employment action that gives rise to an inference of unlawful discrimination under Title VII and the ADEA.

The reasoning set forth above also supports the conclusion that Plaintiff has stated a race-based disparate treatment claim.  Defendant took an adverse employment action when management deactivated Plaintiff's entry badge.  *See* Compl. ¶¶ 31, 36.  As discussed, this action arguably stripped Plaintiff of a key privilege of employment—his right to access private Postal Service property.  Moreover, when the pleadings are viewed in the light most favorable to Plaintiff,

Defendant's action could amount to wrongful discipline, which the Third Circuit has termed a discrete discriminatory action in its own right. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (citing *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)).

Although it is a close question, I also find that Plaintiff's claim narrowly raises an inference of disparate treatment based on race, despite the possibility that Plaintiff's union activity supplies a non-racial explanation for the events. Hinton's stray remarks in 2013, where he called Plaintiff an "old man" and a "gangster," Compl. ¶ 16, do not raise an inference of discrimination based on age or national origin. These comments are far removed from the time period in question and do not appear related to Hinton's alleged assault of Plaintiff or the deactivation of Casselli's entry badge. In contrast, Hinton's threat to "kick [Casselli's] white ass," his subsequent physical assault of Casselli, and his potential involvement in the decision to terminate Casselli's access to the premises following the assault could raise the inference that Defendant's adverse employment action was motivated by racial considerations. *Id.* ¶¶ 16, 20.

Pursuant to Title VII's burden-shifting framework, it is for Defendant at a later stage to offer a legitimate, nondiscriminatory reason to explain its conduct and defeat the inferences raised by Plaintiff's pleadings. *See Burdine*, 450 U.S. at 254.

### III. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiff's Complaint will be granted in part and denied in part. An appropriate order follows.

                                                        /s/ Gerald Austin McHugh
                                                     United States District Judge